Okay, thank you everyone. Our next case is Baliga v. Smith, Appeal No. 23-1786. Mr. McNally. Thank you, Your Honor. May it please the Court, we're here today to ask you to reverse the District Court's grant of summary judgment against Dr. Baliga. Dr. Baliga was a veterinarian licensed by the State of Indiana to administer LASIKs at racetracks on race day for horse racing in the State of Indiana. On September 30th, Dr. Baliga was administering LASIKs at a track, and the process involves being accompanied by a track personnel security guard. The security guard claims that he observed Dr. Baliga take a vial of something out of his pocket, draw from that vial, and inject it into a horse. That report was made trackside to track personnel, not state personnel. And then several hours later, it was reported to the state personnel that are trackside to ensure that on-track penalties are immediately dealt with. So, Mr. McNally, I take it that, or perhaps you do, I don't know. Do you agree that if we take Mr. Hicks' version at his word, that Dr. Baliga took a vial that was not in an authorized box or container in any way, drew from that vial, and then later drew from an authorized vial into the same syringe, do you agree that if we take those allegations to be true, then there was sufficient grounds, or at least rational grounds, for the track suspension that day? I think first, Your Honor, it would be an error to take those allegations as true, because they have never been established. But if, I guess, let me rephrase this. If they were true, would that be a violation of the Commission's rules? I can say it more specifically to this case. I do not think that it is a violation of the track rules for the track officials to issue a summary suspension on eyewitness accounts of rule violations. I don't think that that is a violation. That's not why we're here today. Okay. And so we all agree, then, that if we take Mr. Hicks' version to be true, that Dr. Baliga did commit a rule violation on that day? I do not think that Dr. Baliga committed a rule violation that he was accused by the IHRC staff of committing. So I would have to take issue with that part, Your Honor. What concerns me with what you were starting to say a minute ago is, you know, these allegations come up. This actually happens with people who are reporting things to the police as well. And the moment for testing the truth of Mr. Hicks' account is not simultaneous with the moment when he tells the track judges. The track judges have to act on the basis of allegation, not on the basis of proven fact. I'm sorry. Are you asking me if I agree with that? Right. I mean, so that's the idea of a summary suspension. There's an allegation, if it's an allegation of something serious. Now, for all I know, Mr. Hicks was being malicious. I don't know. But the information that comes to the track judges is from this authorized person who accompanies veterinarians for these LASIKs injections. And what are the judges supposed to do, in your view, at that point? The on-site track judges we're talking about? The on-site track judges who receive a serious allegation. Okay. I think that it depends on the nature of the allegation and the time they have in which to react to it. I do not, for a second, claim that there are going to be situations where they have to act unilaterally based on one person's version of events because of the criticality of the report. I don't disagree with that at all, with that premise. I think that given time, given opportunity, that such a reliance would actually be an error. And we are not here today to talk about whether the efforts that the track judges went through to test the allegations rose to a sufficient level to justify entering the summary suspension. Because I think, as Your Honor pointed out, the whole purpose of a summary suspension is to take action immediately and then have a hearing on the merits at a later date. But isn't that, though, what gets the ball rolling on the later administrative proceedings that are instituted against Dr. Baliga? It is exactly what gets the ball rolling. And at that point in time, it looked like the ball might be rolling downhill. But as the subsequent events develop, we realize that it's not a ball rolling downhill. It's a ball rolling into a dead end. Because at every subsequent step along the way, the IHRC staff that we are suing acted without, in our opinion, any rational basis for their conduct. In connection, if you look at that rational basis as having to be in furtherance of the obligations of the IHRC in the state of Indiana, which is to protect the integrity of racing. Did they have individual motivations that might provide a rational basis like the desire to win? That's a rational basis. But that's certainly not an appropriate rational basis for this context. This context should be, is there a rational basis in furtherance of the purpose of the agency, which is to protect the integrity of the sport? Right. And so if you look at Judge Sweeney's opinion, his main opinion, the threshold for finding a rational basis in this kind of case is very low. It's anything you can think of. And he thinks alleged doping of a horse, even if the test comes back showing that the only thing in the vial was Lasix. There are also disclaimers. Maybe there are other things, whatever. But it's a major part of the business of running a horse track to have procedures of integrity, horses that are not doped, all of that. I completely agree with that, Your Honor. And if they had all of these badges of integrity in force, in place, being followed, then that thought process would have a lot more persuasiveness in my mind. But I'd ask you to consider this. If the intention is to protect the integrity of the racing, when the track officials issued their summary suspension on the word of Mr. Hicks, why did no one ask Mr. Hicks why he waited several hours to report it to the state, to the track officials? Why did no one ask when he first looked into the trash and said he didn't see anything there, and only found the vial several hours later when he went back to look again, what could have happened in that intervening time? Why did no one ask him why he allowed Dr. Baliga to not only administer this alleged foreign substance to this one horse, I am Bonasera, but continue administering injections for several horses later on throughout that day? If the integrity of the track, if the integrity of horse racing is the motivator here, we have a situation where taking Mr. Hicks' statements as true, if they are true, he injected one horse improperly. Who knows how many others were injected improperly? They didn't stop him from continuing to perform injections on subsequent horses. But to me, Your Honor, the most telling part about Mr. Hicks' statement and why I think the on-the-site track people have a little bit more leeway given the happening, the timing of events versus later on, I think it's important to understand that these LASIX vials, they are pre-measured in a secured room. They are counted. They are then administered, and the empty vials are given back to the track official for recounting again in this room. The vials are filled already when he goes out to administer them. So for him to take another vial, he would be pulling it into a full syringe. So that's problem number one. But before you get too much further down this road, I think maybe you make a plausible case that there was something wrong with the way this process worked, and it's a state law guaranteed process. But transforming that, you know, problems under state law into a 14th Amendment equal protection violation is where I'm having trouble here because I can imagine so many explanations, sloppiness or, you know, whatever, to turn into utterly without rational basis. I mean, it depends which of our Del Marcelle opinions you want to go with. Yours, Your Honor. Well, of course. Unfortunately, it did not carry the day, though, so we're actually back at village of Willowbrook against OLEC because those are the people who make the rules. And it's hard for me to see how you can come close to that threshold. So, Your Honor, if I might, as an example, I know I'm nearly out of time here, but as an example, I know we focused a lot about the summary suspension. To me, that is the starting point, but that's not the real problem here. The real problem is what happens in the four years that he is deprived of his license without a hearing on the merits. And the breakdown that you did not have to face in Del Mar is where the rational basis split over whether it's any conceivable rational basis or any reasonable rational basis or whether it applies to whether it's its own element or it goes to the weight of the rational basis in terms of animus. Fundamentally, animus, yeah. I would ask you to consider this. In 2020, after the Indiana Court of Appeals had reversed the default and the Supreme Court had denied transfer, Dr. Baliga reapplies for his license as he is supposed to do. They dismissed it with prejudice, this case. The IHRC did. So this case has no effect any longer. They sit on his application, even though the only thing that had changed between this application and the prior application was this proceeding. And how do we know that's the case? Because he'd been deprived from practicing for four years. He couldn't have done anything. But we also have testimony from the IHRC staff that says the application wasn't materially different. They then sit on it for months. The only way we find out that it has been granted is after we file suit and in a motion to dismiss. They attach the new license to their motion to dismiss, which we had never even been notified of. Judge Sweeney says that there could be any number of different conceivable rationales for this delay. The one he focuses on, they could have been considering his application in light of his past problems. The problem with that is his only past problem that had not previously been considered was this dismissal with prejudice, which I think we can all agree should not have any further force in effect in terms of an impediment to him getting a license from the very agency that did not dismiss it with prejudice. So then if we wrap this up, they sit on it. Judge Sweeney says, well, maybe it's a human failing. She could have waited, right? She could have just been too busy to approve it, et cetera. The issue with the rational basis problem is the first one could very much be a rational basis. We are concerned about a new applicant but for the dismissal with prejudice. If that was their reason and we didn't have the dismissal with prejudice, rational basis test, any conceivable basis applies, motive doesn't matter. But in this instance, what we actually have is no action taken for no legitimate reason. Judge Sweeney says, well, maybe it's human failing. Maybe it's that she's too busy. Not in the record. But he also acknowledges that that could be grounds for liability under a class of one case. That is sort of an as applied, right? The actual testimony that we have, the actual basis she gives. I want to give you some rebuttal time here. Just to wrap this last point up very quickly. If the rational basis is any conceivable basis and it's a blanket protection, then it doesn't really matter with this renewal application. But here we have the actual statement from the person making the decision saying, I just didn't get to it. So why we're considering whether the agency would have otherwise had a rational basis to consider sitting on his application is lost on me. We have the actual testimony from the person saying it. And so I think the jury should be allowed to consider whether these people's explanations for why they did this to Dr. Baliga for four years is a legitimate reason and furtherance of the state purpose. OK, thank you. OK. Ms. Templeton. Thank you, Your Honor. May it please the court. Baliga is seeking money damages for being one of three licensees of the commission prosecuted after an eyewitness observed Baliga inject a horse with an unauthorized substance on a race day. Because the defendants are immune and Baliga has not and cannot demonstrate an equal protection violation, this court should affirm the grant of summary judgment. The defendants who authorized, prosecuted and adjudicated the administrative complaint against Dr. Baliga are entitled to absolute immunity. So the prosecutions against the trainer owner and the assistant trainer in the end, those went nowhere, too, right? They did. Yes. In the end. Yes. They're found specifically because of how the testing came back. But the commission prosecuted those all the way through the merits, which is what the commission and the commission employees were attempting to do with Dr. Baliga. So, again, they treated the other licensees of the commission the exact same way they treated Dr. Baliga. And so he cannot, first of all, demonstrate he was treated differently than similarly situated individuals. Also in the record to that point, Your Honor, I think Smith, the executive director of the Horse Racing Commission, and Holly Newell both testified and explained that they could think of at least one other veterinarian that they prosecuted after having received a negative drug test result. So, again, even if you look at another vet that was accused of injecting a horse with some drug that they couldn't later identify, they prosecuted that person, too. But what do you say about the point about the timeline that Mr. McNally is making? Let's give you that, you know, the immediate report is enough for the summary suspension and there's enough to move forward with administrative proceedings. But it does seem that once the Indiana Court of Appeals has spoken and the whole thing gets dropped, why is there such a long delay? We have to assume the facts as Dr. Baliga states them are true. You can't contest, you know, that he didn't ever get word that the license was reinstated. You can't contest that he had to apply twice and, you know, a number of things like that. Sure. So, and I do think Pittman, the new executive director who was tasked with reviewing this new licensing complaint, explained that at the time Mr. Baliga submitted an application for his license in 2020. It was one near the end of the year, it was in October or September. It was at the same time that the Breeders' Crown races were being run in Indiana. So she was particularly busy and it went to an executive queue that she didn't check regularly and it just slipped her mind. And this court has said… But that's her version. I mean, his version is that there was animus against him and so she deliberately put it on the back burner. But he presented no evidence to support his version. But this is at the pleadings. You know, this isn't… How is he supposed to do that other than put her on a witness stand and have her either be believed or not believed by a trier of fact? Sure. Well, he did have her deposed. He did participate in a deposition and through that there was no testimony. He didn't question her about this and seek another motivation for why she failed to timely approve his license application. And sat on her desk for a couple of months, didn't it? I believe so. Yeah. So, I mean, whatever was going on in Indiana at that point, a couple of months is a long time. I acknowledge that it is a long time, but this court has been clear that bureaucratic inefficiencies aren't an equal protection violation. And that's the most that he can demonstrate is that there was an official who was tasked with reviewing an application of a licensee who had a history with the commission that they believed had violated the rules. A history where he's exonerated every step of the way. I would dispute that he was exonerated, Your Honor, and in part that is because Pittman and Smith, the executive directors, after the Indiana Supreme Court denied transfer and the case came back after the default judgment claim was vacated. Essentially, at that point, they decided that because those proceedings, those court proceedings had lasted so long, there wasn't an additional benefit to be gained because he had already been suspended from practicing on the racetrack approximately as long as the suspension they were seeking. And so I understand that they dismiss that with prejudice and all that, but there was never a finding on the fact that Dr. Baliga did or did not violate the Indiana Horse Racing Commission's rules. Well, he certainly had no incentive for them to continue the proceedings if they were willing to drop them. I'm not sure whether, you know, when something is dropped and a prosecutor decides not to continue with it, sometimes it's for reasons, underlying reasons relating to actual innocence. I realize there's this theoretical possibility that there was some substance in the vial, the nonstandard vial, that just wasn't detected. I mean, we can speculate all we want, but in fact, it was the state that gave up the chance to show that he really had, in fact, committed wrongdoing. We certainly don't want to live in a country where we can just slow walk, you know, criminal or quasi-disciplinary proceedings long enough to get the equivalent of the penalty that you were looking for. That's a little troubling. Of course, Your Honor, and I didn't mean to suggest that. I was just suggesting that there was a reason that would justify the commission deciding to take perhaps a little bit longer than the normal, their goal of 72 hours on a license application. And I know that here they far exceeded that goal. But again, that doesn't… With no notice, apparently, to Dr. Beligo. Sure. But even so, that doesn't demonstrate an equal protection violation because, again, those kinds of mistakes and that kind of bureaucratic inefficiency do not violate the Constitution. And even before… So what do you think the role of animus is in Class of 1 equal protection cases? Again, based on this court's precedent, I don't know that I can give an answer. You have to, though. I mean, we have to decide. Well, I think this court can resolve his equal protection claim earlier. First, I think this court can resolve his equal protection claim because the actions that he challenges are discretionary actions of these government officials. But there's no… Enquist is not a sweeping… The district court, I think, was a little mistaken on this point. Enquist is not a sweeping holding that nothing discretionary is covered by the equal protection clause. You think of the Gynoski case, for example. It's discretionary to write parking tickets. And yet we found a violation in that case. Sure. And in part, what distinguishes Gynoski from this case is the 24, what this court called bogus, parking tickets. And this court was very clear that it was not inviting people with parking tickets, even a couple of invalid parking tickets, from making an equal protection claim. And at most, what we have is two instances of action, of the government taking action against Dr. Baliga. But drastic action. I mean, losing your license. I mean, you wouldn't want to lose your law license for four years. No, and to be clear, Dr. Baliga did not lose his license to practice veterinary medicine in Indiana. He lost his license to practice on racetracks. That was it. I thought there was some dispute about that. But if that's your representation, I'll look at it. That was all that this commission was responsible for. I think for at least a period of that time, and I don't remember how much, the general veterinary license because of this complaint, I think. That's what I understood from the record. But I don't know how long that lasted. And I can't remember now, and I apologize for that. But acknowledging, again, that it is drastic action, you have one instance. And this court was clear in Jankowski that it was not inviting even people with one discretionary action that they thought was unfounded to take that. And again, initiating this complaint against Dr. Baliga was not unfounded. They had an eyewitness account from a licensee of the commission reporting a rules violation. All of the concerns that Baliga proposed today about what Hicks did or did not do, certainly he could have used to confront Hicks with at, for example, the summer suspension hearing. Or at a merits hearing, had there been one. But the commission was entitled to rely upon an eyewitness report from another one of its licensees to initiate this prosecution against Dr. Baliga. And in Katz-Crank, this court held that a class of one equal protection claim cannot be used to challenge discretionary government action, like the decision to initiate prosecution, which is similar to what happened here. Initiated an administrative prosecution, the discretionary action that equal protection claim cannot be used to challenge. But doesn't that really go towards where the theory is based upon an exercise of discretion? For example, even in the case involving a prosecutor, if there was a case where a prosecutor took money to pursue a particular individual, we wouldn't say, oh, we can't get into that equal protection. And so it's not really the overall function of the job generally, but isn't it whether, in that particular case, the theory that the plaintiff is pursuing is that the exercise of discretion was somehow that violated the equal protection clause. As opposed to the exercise was taken because of some personal or ulterior reason. Sure. And I know my time has expired, but if I may answer briefly. And I think that that might be the case, Your Honor. But here, even if we sort of ignore the discretionary part of this, the defendants at all points had a rational basis for pursuing Dr. Baliga. They are tasked with ensuring the integrity of horse racing. They had an eyewitness account from a licensee of the same commission that the rules had been violated. And so if the problem is that they might have initiated the prosecution for some invalid reason, there's a clear rational reason for these defendants to pursue an administrative complaint against Dr. Baliga. Thank you. Thank you. Okay. Thank you, Ms. Tamplin. Mr. Bengali, we'll give you a minute for rebuttal. Thank you, sir. Very quickly, I want to clear up some things in the record. Dr. Baliga did lose his veterinary license. There's mandatory dual reporting. Second, I agree with counsel. If he could have presented his case at the hearing on the summary suspension, maybe all of this would have been avoided. But what is overlooked is he wasn't allowed to do that at the summary suspension hearing, and this is in the briefing. At the summary suspension hearing, he was told that the only issue that is going to be presented is whether the suspension should remain into effect. The underlying merits would be held at a later date. That was one of the issues that the Court of Appeals pointed to and said, you guys told him he was going to get his hearing on the merits. You shouldn't have defaulted him. So he was deprived, even at that stage of presenting his position on the merits, of cross-examining Mr. Hicks to get at what was his motivation for coming up with this story, et cetera. Why didn't he respond to the administrative complaint? He thought, through his counsel, that when he responded to the summary suspension and asked for a hearing, that that was a hearing on the merits. The Court of Appeals has said that the IHRC has a dual track that creates confusion. They have the summary suspension, contested summary suspension track, and the administrative complaint track, and these were conflated. And so when Baliga was told that he was allowed a hearing on the merits, that was understood by us to mean that it was, in total, the IHRC meant, in connection with the summary suspension, the Court of Appeals said, he's entitled to a hearing on the merits. Okay, thank you. Thank you. I'm going to ask that you reverse the case and let us have our day in court. Thank you, counsel, in case we take another advisement.